# In the United States Court of Appeals For the Eighth Circuit

UNITED STATES OF AMERICA,

APPELLEE,

V.

AMONDO ANTOINE MILLER,

APPELLANT.

*Appeal from the
United States District Court for the
District of Minnesota*

## BRIEF OF APPELLEE

LISA D. KIRKPATRICK
  *Acting United States Attorney*

KIMBERLY A. SVENDSEN
  *Assistant U.S. Attorney*

*U.S. Attorney's Office
District of Minnesota
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
(612) 664-5600*

Attorneys for Appellee

## <u>SUMMARY OF THE CASE</u>

Amondo Antoine Miller participated in a nationwide telemarketing fraud conspiracy that bilked tens of thousands of victims—including elderly and otherwise vulnerable individuals—out of hundreds of millions of dollars. A jury found him guilty of conspiring to commit mail fraud and committing substantive counts of wire fraud. The district court sentenced him to 96 months' imprisonment.

Miller brings three claims on appeal. Miller first argues that the indictment should have been dismissed based on his claim that the government presented false testimony to the grand jury. He also argues that the district court abused its discretion in applying a downward variance and sentencing him to 96 months' imprisonment based on his claims that there was insufficient evidence to establish the amount of loss and that his sentence was disproportionate to those of his co-conspirators. Finally, he contends that the evidence was insufficient to support the jury's verdict. The issues are adequately addressed in the parties' briefs, and no oral argument is necessary.

i

# TABLE OF CONTENTS

SUMMARY OF THE CASE......................................................................i

STATEMENT OF THE ISSUES ........................................................... 1

STATEMENT OF THE CASE................................................................ 2

I.     Factual Background ................................................................ 3

       A.     The Fraudulent Magazine Telemarketing Conspiracy
              .......................................................................................... 3

       B.     Miller's Participation in the Conspiracy, Including
              His Operation of Magazine Solutions and Power
              Sales and Marketing ........................................................ 6

II.    Procedural History.................................................................. 12

       A.     Indictment, Trial, and Verdict ........................................ 12
       B.     Motion for Judgment of Acquittal .................................. 14
       C.     Sentencing ....................................................................... 15
              1.     Presentence Report.................................................. 15
              2.     Miller's Objections to the Guidelines
                     Calculation.............................................................. 16
              3.     Sentencing Hearing ................................................ 18

SUMMARY OF THE ARGUMENT........................................................ 24

ARGUMENT ................................................................................... 28

I.     The District Court Did Not Plainly Err By Failing To
       Dismiss the Indictment Sua Sponte Based on Miller's
       Claimed Grand Jury Misconduct. ............................................ 28

       A.     Standard of Review and Legal Standard.......................... 28
       B.     There Was No Falsehood Before the Grand Jury and
              No Basis to Dismiss the Indictment Based on Grand
              Jury Error. ...................................................................... 29

II.    The District Court Did Not Clearly Err in Applying a 16-
       Level Enhancement for Loss Amount Over $1.5 Million.......... 36

ii

A. Standard of Review and Legal Standard .......................... 36

B. The District Court Did Not Clearly Err by Finding the Loss That Resulted From Miller's Offense Was Between $1.5 Million and $3.5 Million. ........................... 37

III. The District Court Did Not Abuse Its Discretion by Imposing a 96-Month Sentence. ................................... 41

A. Standard of Review ............................................. 41

B. The District Court Did Not Abuse Its Discretion by Imposing a 96-Month Term of Imprisonment ................. 43

IV. The Verdict Was Supported by Overwhelming Evidence ......... 47

A. Standard of Review ............................................. 47

B. The Evidence Was Sufficient ............................... 48

CONCLUSION ................................................................ 57

CERTIFICATE OF COMPLIANCE ................................... 58

Appellate Case: 24-3166     Page: 4     Date Filed: 04/11/2025 Entry ID: 5505443

# TABLE OF AUTHORITIES

Cases

*Cavazos v. Smith*, 132 S. Ct. 2 (2011) ................................................. 48

*Gall v. United States*, 552 U.S. 38 (2007).......................................... 42

*United States v. Anwar*, 880 F.3d 958 (8th Cir. 2018) ....................... 42

*United States v. Aungie*, 4 F.4th 638 (8th Cir. 2021) ......................... 47

*United States v. Bass*, 478 F.3d 948 (8th Cir. 2008) .......................... 34

*United States v. Bolden*, 596 F.3d 976 (8th Cir. 2010) ...................... 41

*United States v. Bonnell*, 932 F.3d 1080 (8th Cir. 2019) ........... passim

*United States v. Bradford*, 113 F.4th 1019 (8th Cir. 2024) ..... 1, 39, 40

*United States v. Burns*, 834 F.3d 887 (8th Cir. 2016) ........................ 41

*United States v. Chinasa*, 489 F. App'x 682 (4th Cir. 2012) .............. 55

*United States v. Dickson*, 127 F.4th 722 (8th Cir. 2025) ............... 1, 45

*United States v. Druger*, 920 F.3d 567 (8th Cir. 2019) ............. passim

*United States v. Feemster*, 572 F.3d 455 (8th Cir. 2009) ................... 42

*United States v. Fenner*, 600 F.3d 1014 (8th Cir. 2010).......... 1, 34, 35

*United States v. Fishman*, 645 F.3d 1175 (10th Cir. 2011) .............. 55

*United States v. Fry*, 792 F.3d 884 (8th Cir. 2015) ........................... 44

*United States v. Gaye*, 902 F.3d 780 (8th Cir. 2018)............... 1, 39, 44

Appellate Case: 24-3166     Page: 5     Date Filed: 04/11/2025 Entry ID: 5505443

*United States v. Hall*, 825 F.3d 373 (8th Cir. 2016).....................42, 46

*United States v. Hansen*, 791 F.3d 863 (8th Cir. 2015) .............passim

*United States v. Harmon*, 944 F.3d 734 (8th Cir. 2019) ..............36, 37

*United States v. Hodge*, 588 F.3d 970 (8th Cir. 2009)........................40

*United States v. Jackson*, 155 F.3d 942 (8th Cir. 1998).....................29

*United States v. Jones*, 701 F.3d 327 (8th Cir. 2012)..........................41

*United States v. Karie*, 976 F.3d 800 (8th Cir. 2020).......................1,36

*United States v. Kessler*, 321 F.3d 699 (8th Cir. 2003) ......................54

*United States v. Kouba*, 822 F.2d 768 (8th Cir. 1987) ........................34

*United States v. Lazarski*, 560 F.3d 731 (8th Cir. 2009)...............1, 42

*United States v. Lazenby*, 439 F.3d 928 (8th Cir. 2006) ....................44

*United States v. Louper-Morris*, 672 F.3d 539 (8th Cir. 2012) .. passim

*United States v. Lundstrom*, 880 F.3d 423 (8th Cir. 2018)................47

*United States v. McDowell*, 676 F.3d 730 (8th Cir. 2012).................45

*United States v. Pascacio-Rodriguez*, 749 F.3d 353 (5th Cir. 2014) ..55

*United States v. Pierre*, 870 F.3d 845 (8th Cir. 2017) .........................44

*United States v. Pumpkin Seed*, 572 F.3d 552 (8th Cir. 2009) ....28, 35

*United States v. Rogers*, 769 F.3d 372 (6th Cir. 2014).......................55

*United States v. Roy*, 783 F.3d 418 (2d Cir. 2015) .............................55

v

*United States v. Savage*, 414 F.3d 964 (8th Cir. 2005) ...................... 36

*United States v. Skog*, 820 F. App'x 494 (8th Cir. 2020)................... 42

*United States v. Smialek*, 970 F.3d 1070 (8th Cir. 2020) .......... passim

*United States v. Soliz*, 857 F.3d 781 (8th Cir. 2017)......................... 45

*United States v. Weston*, 443 F.3d 661 (8th Cir. 2006) ..................... 54

*United States v. Wisecarver*, 911 F.3d 554 (8th Cir. 2018) ............... 41

*United States v. Ziesman*, 409 F.3d 941 (8th Cir. 2005)................... 29

*Whitfield v. United States*, 543 U.S. 209 (2005)............................... 56

Statutes

Title 18 United States Code § 1343.................................................... 12

Title 18 United States Code § 2326....................................... 13, 19, 21

Title 18 United States Code § 3553(a)(6) .......................................... 44

Title 18 United States Code §§ 1341 ................................................. 12

Rules

U.S.S.G. § 2B1.1(b)(1) ....................................................................... 36

U.S.S.G. § 2B1.1(b)(1)(I) ...................................................... 24, 36, 37

Appellate Case: 24-3166    Page: 7    Date Filed: 04/11/2025 Entry ID: 5505443

# STATEMENT OF THE ISSUES

I.  Did the district court plainly err by failing to dismiss the indictment sua sponte based on the case agent's grand jury testimony that Miller was the owner of Magazine Solutions when the testimony was true as a practical matter, was consistent with other witnesses' trial testimony, and the petit jury found Miller guilty?

> *United States v. Smialek*, 970 F.3d 1070 (8th Cir. 2020)
> *United States v. Fenner*, 600 F.3d 1014 (8th Cir. 2010)

II.  Did the district court clearly err in applying a 16-level enhancement for loss amount over $1.5 million where the district court relied on data from an online tool Miller and his employees used to track the amount of money Miller's company collected from victims?

> *United States v. Bradford*, 113 F.4th 1019 (8th Cir. 2024)
> *United States v. Karie*, 976 F.3d 800 (8th Cir. 2020)
> *United States v. Gaye*, 902 F.3d 780 (8th Cir. 2018)

III.  Is this the nearly inconceivable case where the district court abused its considerable sentencing discretion by imposing a 96-month sentence and not varying downward still further?

> *United States v. Dickson*, 127 F.4th 722 (8th Cir. 2025)
> *United States v. Lazarski*, 560 F.3d 731 (8th Cir. 2009)

IV.  Was the verdict supported by sufficient evidence where the jury heard that Miller voluntarily and intentionally joined an agreement to defraud victims by tricking them into paying for unwanted magazine subscriptions?

> *United States v. Druger*, 920 F.3d 567 (8th Cir. 2019)
> *United States v. Hansen*, 791 F.3d 863 (8th Cir. 2015)
> *United States v. Louper-Morris*, 672 F.3d 539 (8th Cir. 2012)

Appellate Case: 24-3166    Page: 8    Date Filed: 04/11/2025 Entry ID: 5505443

## STATEMENT OF THE CASE

Defendant Amondo Antoine Miller participated in a large, nationwide telemarketing fraud scheme involving magazine subscription sales. Miller's role in the fraud scheme was twofold: he ran a telemarketing call center for a fraudulent magazine company, and he also acted as a lead broker selling fraudulent "lead lists" of victim consumers who had active and ongoing subscriptions to be used by other magazine companies to perpetrate the fraud.

Miller and others conspired to defraud victims across the country, many of whom were elderly and otherwise vulnerable. Miller and his co-conspirators fraudulently induced consumers into making payments related to purported magazine subscriptions. Telemarketers working for the fraudulent companies called lists of consumers and told a series of lies, including that the telemarketer was calling from the consumer's existing magazine company and was calling in order to reduce the monthly payments for an existing magazine subscription. In reality, the company had no existing relationship with the consumer and tricked the consumer into paying

2

for an expensive, new magazine subscription that they did not want or understand they were ordering.

## I. Factual Background

### A. The Fraudulent Magazine Telemarketing Conspiracy

Beginning by at least 2000, magazine subscription telemarketing companies across the country called individuals with existing magazine subscriptions and deceived victim consumers into paying for new, expensive and unwanted magazine packages. (Tr./II 392-393.) Telemarketers represented that they were calling about the victims' existing magazine subscriptions and offered to provide something of value, such as reducing the ongoing monthly payments or shortening the payment period. (*Id.* 394, 406, Tr./IV 597-98, Tr./V 807, 821-22.) In reality, the telemarketers signed up the victims for new magazine subscriptions that they did not approve or want. (*Id.*)

Far from operating in isolation, the magazine companies functioned in concert. (Tr./IV 529-31.) After charging unsuspecting victims for new magazine subscriptions they did not agree to, the companies sold or traded the victims' personal information (including name, address, existing subscription details, and credit card number)

to other magazine companies perpetrating the same fraud. (*Id.* 549-50.) The next fraudulent magazine company, in turn, called the victims and repeated the same scam. (*Id.* 552-53, Tr./V 844-45, 857.)

The effect was that a single consumer went from having one magazine subscription to, at times, more than a dozen, all with different fraudulent magazine companies, each "sold" under the auspices of "reducing" the consumer's monthly rate. Some of the victims were being charged by a dozen or more companies a month and were charged more than $50,000 for magazines they did not want or knowingly order. (Gov't Exh. A-16.) For example, one victim's bank statement for March and April 2018 contains 16 charges for magazines from 10 different magazine telemarketing companies, including two charges from Magazine Solutions, for a total of $841:

4

**Withdrawals**

| Date | Description | | Amount |
|------|-------------|---|--------|
| 3-12 | Quality Readers 8863892973 | MN USA | $49.90 |
| 3-15 | Mag Direct 877- 7203386428 | AZ USA | 39.98 |
| 3-15 | Central Subscri 866-2085290 | MN USA | 59.80 |
| 3-21 | Magazines 84491 8449180000 | MO USA | 59.89 |
| 3-21 | Magazines 84491 8449180000 | MO USA | 59.90 |
| 3-22 | Central Subscri 866-2085290 | MN USA | 59.80 |
| 3-22 | Readers Club of 877-4169777 | MO USA | 49.50 |
| 4-2 | Magazine Solut0 866-6087323 | CO USA | 49.95 |
| 4-2 | Magazine Svc   866-9361829 | FL USA | 59.90 |
| 4-3 | Readers-1888684 Panama | PA Pan | 89.95 |
| 4-3 | Foreign Transaction Fee | | 2.69 |
| 4-4 | Mag Direct 877- 7203386428 | AZ USA | 39.98 |
| 4-4 | Np Readers86632 Toronto | On Can | 29.90 |
| 4-4 | Foreign Transaction Fee | | 0.89 |
| 4-5 | Magservices    877-269-4048 | CA USA | 49.98 |
| 4-5 | Magazine Svc   866-9361829 | FL USA | 39.92 |
| 4-6 | Pacific Beach R 888-7138086 | CA USA | 49.75 |
| 4-9 | Magazine Solut0 866-6087323 | CO USA | 49.95 |
| **Total** | | | **$841.63** |

(Gov't Exh. A-8, at 231.)

The co-conspirators and their companies worked together to carry out their scheme. Among other things, they bought, sold, and traded "lead lists" of victim consumers to one another. (Tr./II 395.) The lead lists—known as "PDS" or "paid-during-service" leads—contained names and contact information for consumers who had active and ongoing subscriptions. (Tr./III 446-47, Tr./IV 549-50, Tr./VII 1429.) The companies used the information on these lead lists to defraud consumers by fraudulently pretending to be calling from the customers' existing magazine provider to discuss the status of an existing magazine subscription. (Tr./V 844-45.)

Some PDS leads had more detailed information, identifying not only the customer's name and contact information, but their address, age, profession, credit card number, and list of magazines to which the customer subscribed. (*Id.* 856.) They contained the names of those consumers—disproportionately elderly and otherwise vulnerable—who would fall for the fraud again and again. (Tr./III 447, Tr./IV 554.) As such, the leads were sold at a considerable premium. (Tr./IV 550-51.)

## B. Miller's Participation in the Conspiracy, Including His Operation of Magazine Solutions and Power Sales and Marketing

Starting in at least 2009, Miller ran a fraudulent magazine subscription sales company based in Colorado called Magazine Solutions. (Tr./VII 1305.) He oversaw a team of telemarketers who called individuals on PDS lead lists—that is, people with existing magazine subscriptions—and lied to them to sign them up for new magazine subscription packages that they never agreed to purchase. (*Id.* 1311, 1316, 1328-29, 1396.) At the same time, Miller worked as a lead broker through a related company called Power Sales & Marketing. (Tr./VI 1022-25.) Miller provided his Magazine Solutions

6

telemarketers with blank Power Sales and Marketing "lead sheets" and directed the telemarketers, after completing a sale, to fill out those lead sheets by hand, listing the victim's name, address, phone number, payment information, and magazine subscription package. (Tr./VII 1312-13.) Miller then compiled those handwritten lead sheets and sold them to other magazine companies and lead brokers that participated in the conspiracy. (Gov't Exhs. C-24, C-32.)

Miller knowingly participated in the fraudulent conspiracy in two respects: as a company owner, whose telemarketers defrauded victims directly; and as a lead broker, who sold victims' personal information to other co-conspirators knowing that it was used to perpetuate the same fraud scheme. First, Miller operated Magazine Solutions as a fraudulent magazine telemarketing company. Miller oversaw the company's sales floor (Tr./VII 1328-29); Miller trained telemarketers how to deceive victims (*id.* 1309); and Miller provided telemarketers with the scripts they used to perpetrate the fraud (*id.* 1311, 1396). For example, Miller provided Magazine Solutions telemarketers with the below sales script:

Hello is FIRSTNAME in? This is_____ with **Magazine Solutions,**
we are the folks who send out all the magazines.
How are you today?

I am not calling to collect any money from you so don't be alarmed, We just
want to make sure your magazines are coming in on time and in good condition
for ya? *(wait for response) (if reply is yes)*

Well good,  You are a preferred customer here with our company receiving your
magazines at the low cost rate of $1.66 a week, for your 2 years of service so
there is no need to order anymore , you are set for quite some time.

We do a  survey each month on the use of major credit cards, Do you carry
VISA , MASTER CARD or DISCOVER?

And last but not least....

What are your favorite magazines out of the ones you are recieving? (Log the
titles they tell you)

Ok Great!

For you taking your time here with me today you will recieve a free hotel room in
a destination of your choice like Las Vegas , Cancun , Miami and many
more!!  (IF YOU ARE A CLOSER GO TO CAPPER
PITCH)

Again, Thank you for your time and please hold my  supervisor has a couple of
quick questions on your address,

Could you please put in a word for me I am up for a raise? Thank you again!

(*Id.* 1309-10; Gov't Exh. B-17.)

The scripts Miller provided to his telemarketers to use at

Magazine Solutions contained false statements that the telemarketers

were "not calling to collect any money." (Tr./VII 1396-98.) They falsely

represented themselves as calling solely about the magazines the

8

victims were already receiving. (*Id.* 1311-12, 1396-97.) They never told the victims that they were signing up those victims for new subscription packages. (*Id.*) But in reality, the Magazine Solutions telemarketers were "calling to sign [victims] up for a new magazine subscription, which entitled collecting money." (*Id.* 1398.)

Miller knew that his telemarketers were following the scripts and telling the lies contained therein. Miller listened in on his telemarketers' sales calls. (*Id.* 1328; Tr./XIV 3239-40.) Miller monitored the calls to ensure that his telemarketers were lying to customers as the scripts instructed. (*Id.*) And in addition to coaching his employees to lie to customers, Miller personally acted as the salesperson, closer, verifier or collector on at least 451 calls with victims between 2014 and 2020. (Tr./XIII 2772-74; Gov't Exh. P-4.)

Miller used the victim information generated by his telemarketers' calls to victims at his telemarketing company, Magazine Solutions, to make more money as a lead broker through his other company, Power Sales and Marketing. Miller gave his telemarketers at Magazine Solutions blank Power Sales and Marketing lead sheets. (Tr./VII 1312-13.) Each salesperson "would

9

have a little stack of [those lead sheets] on their table," and the telemarketers would fill in the customer information whenever they made a "sale." (*Id.*) Miller stored the completed Power Sales and Marketing lead sheets in a closet at the Magazine Solutions office, (*id.* 1316), and then sold those leads to other companies in the fraudulent magazine industry. (Gov't Exhs. C-24, C-32.)

For example, in 2013, Miller met co-conspirator Wayne Dahl, who owned and operated a magazine telemarketing company called Your Magazine Service, through another co-conspirator named Brian Cox. (Tr./IV 543-44, 573-74, 578-79; Gov't Exh. Q-9.) Prior to meeting Miller, Dahl had been purchasing leads from Cox. (Tr./IV 574.) According to Dahl, he "paid good money" to Cox for "some files that did not perform" (i.e., PDS leads that ultimately did not yield fraudulent sales), so he flew to Georgia, where Cox lived, and confronted Cox directly. (*Id.* 573-74.) Dahl explained that Cox "started crying a little" and then "made a phone call to the person he got the leads from, which was Amondo Miller." (*Id.* 575) Eventually, Cox "put [Dahl] on the phone with Amondo." (*Id.*) Miller apologized about the "misunderstanding" and promised to "replace" the file. (*Id.*) Cox

10

provided Dahl with Miller's contact information, and then Dahl and Miller began working together on "[t]he business of fraud." (*Id.* 576.) They communicated directly via email. (*Id.*) Miller's leads were extremely valuable to Dahl because Miller "had really good data, hard copies, which are the best leads you can buy in the industry, and you make an extremely large amount of money off that data." (*Id.*)

Miller sold PDS leads to several fraudulent magazine telemarketing company owners and employees, including Dahl, Eric McGarrity, Jared Michelizzi, Daniel Klibanoff, and James Sierra. (Tr./IV 588, 596-97, Tr./V 856, Tr./VI 1022-25, Tr./VII 1430, Tr./IX 1943, Gov't Exhs. C-10, C-12, C-23, C-27, C-32; C-90.) The lead lists Miller sold to his co-conspirators included victim data like names, addresses, telephone numbers, credit card numbers, expiration dates, billing dates, and the magazines the victims were receiving, that would assist the other magazine telemarketing company owners in defrauding the victims by pretending to be their existing magazine companies. (Tr./IV 593, 596-97.) Miller's handwritten "hard copy" leads were "the best leads you could possibly get." (Tr./V 856.)

11

Miller used a customer relationship management (CRM) tool called PS Online to handle the recurring billing functionality for Magazine Solutions. (Tr./XI 2456, Tr./XII 2766-67.) PS Online maintained a cash status report that reflected all of a magazine telemarketing company's orders on a month-by-month basis. (Tr./XI 2460, Tr./XII 2767-68; Gov't Exh. P-2a.) The PS Online cash status report for Magazine Solutions reflected that in total, Magazine Solutions collected over $2.7 million from victims. (Tr./XII 2770-71; Gov't Exh. P-2a, at 5.) During the same time period, Magazine Solutions entered into contracts with victims that totaled over $4.9 million. (*Id.*)

## II. Procedural History

### A. Indictment, Trial, and Verdict

On October 20, 2020, a federal grand jury returned an indictment charging Miller and 42 other defendants with conspiracy to commit mail fraud in violation of 18 U.S.C. §§ 1341 and 1349. (R. Doc. 15, Indictment.) The indictment included substantive mail and wire fraud counts, including 6 counts in which Miller was charged with wire fraud in violation of 18 U.S.C. § 1343. (R. Doc. 15, Counts 11, 15,

Appellate Case: 24-3166    Page: 19    Date Filed: 04/11/2025 Entry ID: 5505443

18, 21, 26, and 32.) Each count of the indictment alleged that the enhanced penalties of 18 U.S.C. § 2326 applied because the offense was committed in connection with telemarketing and victimized ten or more persons over the age of 55. (R. Doc. 15.)

Miller's trial, along with co-defendants Tashena Crump and Ballam Dudley,[1] began on October 12, 2023. (R. Doc. 1932.) During the trial, the jury heard from 48 witnesses, received thousands of pages of documentary evidence, and listened to hours of audio recordings. Two of the substantive wire fraud counts were dismissed during trial—one on the government's motion, and one in response to Miller's motion for judgment of acquittal. (R. Doc. 2000, R. Doc. 2004.) At the conclusion of the 17-day jury trial, the jury returned a verdict of guilty on all remaining counts against Miller, including conspiracy to commit mail fraud and four counts of wire fraud. (R. Doc. 2014.) The jury further found that each count was in connection with the conduct of telemarketing and each offense victimized ten or more persons over the age of 55. (*Id.*)

---

[1] *See United States v. Tashena Crump*, Appeal Number 24-3166.

Appellate Case: 24-3166     Page: 20     Date Filed: 04/11/2025 Entry ID: 5505443

## B. Motion for Judgment of Acquittal

After the jury convicted him of Counts 1, 11, 15, 18, and 26, Miller moved for judgment of acquittal on those counts. (R. Doc. 2070.) As to the conspiracy count, Miller conceded that the government had proven the existence of a conspiracy to commit mail fraud, but he argued that there was insufficient evidence to demonstrate that he knew of the agreement, knew the purpose of the agreement, or voluntarily and intentionally joined it. (*Id.* at 3-4.) Similarly, Miller claimed that the government had presented insufficient evidence to prove his guilt beyond a reasonable doubt on the substantive wire fraud counts. (*Id.* at 6-12.) Miller also filed a motion for new trial in which he objected to several of the jury instructions. (R. Doc. 2071.)

The district court denied Miller's motions as to the conspiracy count and three of the substantive wire fraud counts, finding that "the government introduced copious evidence supporting the convictions," and that "the backdrop of coconspirator testimony, victim testimony, fraudulent scripts, lead lists, other documentary evidence seized from Defendants' places of business, undercover recordings, and victim bank statements cannot be ignored." (R. Doc. 2307, at 4.)

14

The district court found ample evidence that Miller knowingly and willfully joined the conspiracy, including his employees' testimony that they used fraudulent sales scripts at his direction and his sale of lead lists, which the jury was entitled to conclude Miller knew would be used to commit fraud. (*Id.* at 5.) Similarly, the district court sustained three of the substantive wire fraud counts, finding that "the jury reasonably concluded that Miller either knew or was willfully blind to the fact that the lead lists would be used in a fraudulent scheme." (*Id.* at 9.) The district court also rejected Miller's objections to the jury instructions and denied his motion for a new trial. (*Id.* at 14-18.)

The district court granted Miller's motion for acquittal of Count 26 on the ground that the government failed to establish that the charged email traveled across state lines. (*Id.* at 7-8.)

## C.  Sentencing

### 1.  Presentence Report

The United States Probation Office calculated a total offense level of 34 and a criminal history category of III. (PSR ¶¶ 118-128, 130-146.) The Guidelines calculation was based on a base offense level of 7, a 16-level enhancement because Miller was responsible for

15

$2,722,431.11 in loss as a result of the fraudulent magazine scheme, a 2-level enhancement because the offense involved 10 or more victims and was committed through mass marketing, a 2-level enhancement because the offense involved sophisticated means and the defendant's conduct was especially intricate and complex, a 2-level adjustment because the defendant knew or should have known that a victim of the offense was a vulnerable victim, a 2-level adjustment because the offense involved a large number of vulnerable victims, and a 3-level enhancement because the defendant was a manager or supervisor. (PSR ¶¶ 119, 121-123.) The resulting Guidelines range was 188 to 235 months' imprisonment. (PSR ¶ 176.)

### 2. Miller's Objections to the Guidelines Calculation

Prior to sentencing, both parties submitted position pleadings. Instead of seeking a Guidelines sentence of 188 to 235 months, the government requested a sentence of 144 months' imprisonment based on, among other factors: (1) Miller's dual role both running a fraudulent magazine company and acting as a lead broker selling fraudulent lead lists used by other magazine companies to perpetrate the fraud; (2) Miller's participation in a large, nationwide fraud

Appellate Case: 24-3166     Page: 23     Date Filed: 04/11/2025 Entry ID: 5505443

scheme that defrauded thousands of elderly and otherwise vulnerable victims; (3) Miller's collection of over $2.7 million from victims, and the fact that he benefited by receiving a significant portion of these profits; (4) Miller's aggravating role in the offense, which placed him among the most culpable of those involved in the scheme; (5) the need for specific and general deterrence; and (6) Miller's criminal history, including kidnapping at gunpoint a person who had stolen drugs from him. (R. Doc. 2465.)

Miller objected to the loss calculation contained in the PSR, contending that the appropriate loss amount would be less than $1.5 million because the $2,722,431.11 loss calculation was based on too long a timeframe and contained amounts that should have been deducted. (R. Doc. 2467, at 7-15.) He contended that he should not receive an enhancement for sophisticated means because he claimed that other participants in the scheme engaged in conduct that was more sophisticated than his. (*Id.* at 15-16.) With respect to the role enhancement, Miller objected based on his contention that he was not the owner and operator of Magazine Solutions for the entire time period of the conspiracy. (*Id.* at 1, 16-17.)

Appellate Case: 24-3166    Page: 24    Date Filed: 04/11/2025 Entry ID: 5505443

Miller also moved for a downward departure or a variance, contending that the loss calculation was overstated, that his criminal history category substantially overstated the seriousness of his prior offenses, and based on the § 3553(a) factors, including the need to avoid an unwarranted disparity between Miller's sentence and those of his co-conspirators. (*Id.* at 2, 17-23.) Miller requested a sentence of time served or, alternatively, a sentence of three years' imprisonment. (*Id.* at 2.)

### 3.    Sentencing Hearing

At the sentencing hearing, Miller maintained his objections to the 16-level enhancement for loss amount, the sophisticated means enhancement, and the role enhancement. (R. Doc. 2562, at 4-11.) The government relied on the evidence presented at trial in support of each enhancement. As to the amount of loss, the government pointed out that cash status reports maintained by PS Online, the customer relationship management tool Miller's companies used, reflected that Miller's companies actually collected $2.7 million from victims, but the companies billed the victims for a total of $4.9 million. (*Id.* at 13.) If the district court calculated the Guidelines using this $4.9 million

18

intended loss, this would result in an even larger enhancement. (*Id.*) As to sophisticated means, the government relied on Miller's use of a nominee owner for his telemarketing company and the fact that he operated both a telemarketing company and as a lead broker. (*Id.* at 15-16.) As to the role enhancement, the government relied on the trial evidence reflecting that Miller ran his companies in every respect and the jury's rejection of his claim that his wife was operating the companies. (*Id.* at 11-12.)

The district court overruled Miller's objections regarding the Guideline enhancements and adjustments. The district court found that the amount of loss was correctly calculated based on the PS Online report admitted in evidence at trial. (*Id.* at 20.) The district court relied on the "scheme for getting people to turn over credit card numbers and to agree to magazines that they really didn't want . . . with the buying of lists and all that was done to make these purported sales" as sophisticated means that Miller employed. (*Id.* at 20-21.) As to the role enhancement, the district court found based on the trial evidence that Miller had "a role of running the company and being heavily involved in the managing and oversight and telling people how

19

to make the sales, purchasing and selling lists, and everything that was necessary to make this process work." (*Id.* at 21.)

The district court granted Miller's motion for a downward departure based on overstatement of criminal history and treated Miller's criminal history as a Category II. (*Id.* at 25.) As a result, the district court calculated a total offense level of 34, a criminal history category II, and a resulting Guidelines range of 168 to 210 months. (*Id.* at 26.)

The district court requested arguments from the parties based on the § 3553(a) factors, "bearing in mind the Court's attempts here to make sure that we have no unwarranted sentencing disparities with other defendants in this case, and there are, of course, many." (*Id.* at 27.)

Miller requested that the district court impose a sentence of three years' imprisonment, based in part on his argument that such a sentence would avoid unwarranted disparities with the sentences his co-conspirators received. (*Id.* at 27, 32-37.) Miller cited a co-conspirator with a higher loss amount and a higher Guideline range, and who lived a wealthy lifestyle based on the proceeds of the fraud,

who received a sentence of 120 months. (*Id.* at 33.) He also provided examples of magazine company owners who received sentences of three or nine months. (*Id.* at 34.)

Because Miller persisted in failing to accept responsibility throughout the sentencing process, instead of continuing to seek a downward variance to 144 months, the government sought a bottom-of-the-Guideline range sentence of 168 months. (*Id.* at 37-40.) The government disagreed with Miller's assessment of his relative culpability in the scheme, arguing that Miller was a leader of the scheme because he used his telemarketing company to generate leads that he sold via his lead broker company, and those leads were found at telemarketing companies all over the country. (*Id.* at 42.) The government distinguished Miller's conduct from that of specific co-conspirators who received lower sentences. (*Id.* at 44-45.)

Prior to the imposition of sentence, Miller addressed the district court. (*Id.* at 50-54.) He persisted in refusing to take responsibility, claiming that he never intended to scam anyone, blaming the victims' losses on "occasional billing mistakes," and taking the position that he "focused on providing quality service." (*Id.*)

21

After hearing both parties' arguments, the district court applied nearly a 50% downward variance and sentenced Miller to 96 months' imprisonment. (*Id.* at 55.) The district court began its analysis by highlighting its consideration of Miller's co-conspirators' sentences:

> Bear in mind that I have to take into account the sentences given to co-defendants, that that is significant. I can't—in terms of no unwarranted sentencing disparities, I can't put you up as high as Mr. Anthony Moulder, in part because of the massive amount of money involved in his case. I feel that you belong below that, but at the same time, [the government] makes really good points about the extent of your involvement in this case.

(*Id.* at 55-56.) The district court went on to discuss Miller's history and characteristics:

> Your history and characteristics are mixed, like most people. You know, there are some challenging childhood issues, although not nearly as bad as many of the people that I see. Wrong influences are a problem for a lot of people. And I do appreciate many of the good things, including the coaching, that you have done. I have taken into account the substance disorder issue, which obviously we personally observed.

(*Id.* at 56.) The district court took into account each of the remaining § 3553(a) factors, including the seriousness of the offense and the need to provide just punishment:

> I do find the sentence to be serious. There's no question about it. It is a very serious fraud and when you take it all together, it's the largest elder fraud set of convictions in the nation and you were, at least for a time, an owner and you were involved in passing along the lists.

22

I'm not worried about protecting the public from you in the future. I think that this is in the past now.

I do want to make sure, and it's one of the reasons for not a higher sentence, that you do not receive a penalty for going to trial, which you exercised that right, which you have a right to do, and I do feel strongly about that.

I do feel that this is just punishment. It will represent deterrence and also the seriousness of the offense and the length of time that you were involved, not necessarily the money, which was less and I don't see evidence of a, you know, flagrantly rich lifestyle as a result of this, but at the same time, it lasted for a long period of time. And the dual role, which [the government] makes a point of, I think is one that I have also taken into account. All in all, I find the sentence to be sufficient, but not more than necessary.

(*Id.* at 55-57.) Miller filed a timely notice of appeal. (R. Doc. 2597.)

Appellate Case: 24-3166     Page: 30     Date Filed: 04/11/2025 Entry ID: 5505443

## SUMMARY OF THE ARGUMENT

The district court did not err, much less plainly so, by failing to dismiss the indictment sua sponte because one of the government's case agents testified before the grand jury that Miller was the owner of the magazine telemarketing company that he ran, Magazine Solutions. The testimony was true as a practical matter—Miller's wife was a nominee owner. It was also consistent with the testimony of Miller's employees, who testified that Magazine Solutions was Miller's company, and they viewed him as the owner. Moreover, a petit jury's verdict of guilty renders any grand jury error harmless. Miller's counsel had a full opportunity to cross-examine the case agent regarding any inconsistency between his grand jury testimony and the Colorado Secretary of State documents incorporating Magazine Solutions. Because the trial jury found Miller guilty, Miller cannot establish any actual prejudice based on this grand jury testimony.

Next, the district court did commit clear error in concluding that Miller was eligible for a 16-level increase under U.S.S.G. § 2B1.1(b)(1)(I) because the loss from Miller's offense was more than $1.5 million but less than $3.5 million. The district court credited

24

evidence presented at trial that established the loss amount. Specifically, Miller's companies used an online tool called PS Online to track their magazine orders. That tool reflected the total amount of money Magazine Solutions collected from its victims was $2,722,431.11. The district court's factual findings in support of the enhancement were not clearly erroneous, and the application of the enhancement should be affirmed.

Miller's claim that the district court's imposition of a below-Guidelines sentence of 96 months' imprisonment was an abuse of discretion similarly fails. Miller contends that the district court's sentence created unwarranted sentencing disparities between him and some of his co-conspirators. Considerations of unwarranted sentencing disparities under § 3553(a) concern national disparities, not comparisons with sentences received by co-conspirators. In any event, the district court carefully considered the sentences it had imposed on Miller's co-conspirators in arriving at a fair and just sentence for Miller that was approximately one half of the Guidelines range. The district court did not abuse its discretion by not varying downward even more.

25

Finally, the district court did not err in denying Miller's motion for a judgment of acquittal because the evidence against Miller was overwhelming. The government presented evidence of a nationwide telemarketing scheme that defrauded victims—including elderly and otherwise vulnerable individuals—by lying to the victims to trick them into paying for new, unwanted magazine subscriptions.

It also presented evidence that Miller voluntarily and intentionally joined in the agreement, knowing the purpose of the agreement. The government presented evidence to show that Miller operated a fraudulent telemarketing company, Magazine Solutions, where he provided his employees with scripts to use on telemarketing calls to defraud the victims, trained his employees to deceive people on the calls, and monitored their calls to ensure they were delivering the scripts correctly. Miller sold leads consisting of the victims' personal information collected on the telemarketing calls to the owners of other fraudulent magazine telemarketing companies nationwide via his lead brokerage company, Power Sales and Marketing. Miller's arguments to the contrary run counter to the sufficiency standard, which requires that the evidence be viewed in

26

the light most favorable to the verdict. The evidence supporting the jury's verdict was more than sufficient, and the judgment of conviction should be affirmed.

# ARGUMENT

## I. The District Court Did Not Plainly Err By Failing To Dismiss the Indictment Sua Sponte Based on Miller's Claimed Grand Jury Misconduct.

### A. Standard of Review and Legal Standard

Miller claims the indictment should be dismissed based on his claim that the grand jury heard inaccurate evidence about his ownership of the magazine company he controlled, Magazine Solutions. "In reviewing the district court's denial of a motion to dismiss the indictment for alleged government misconduct, [this Court] review[s] the district court's factual findings for clear error and its legal conclusions de novo." *United States v. Pumpkin Seed*, 572 F.3d 552, 557 (8th Cir. 2009) (cleaned up).

However, Miller forfeited the issue by failing to raise it before the district court, so this Court's review is for plain error. *United States v. Smialek*, 970 F.3d 1070, 1075 (8th Cir. 2020). Under the plain error standard, "this Court will affirm the conviction unless (1) the district court made an error, (2) the error was plain under current law, meaning clear and obvious, and (3) the error was prejudicial and

28

affected the trial outcome." *United States v. Jackson*, 155 F.3d 942, 947 (8th Cir. 1998) (citation omitted).

"Even if [Miller] had preserved this issue, he would need to show prejudice because [this Court] only dismiss[es] a grand jury indictment 'upon a showing of actual prejudice to the accused.'" *Smialek*, 970 F.3d at 1075 (quoting *United States v. Ziesman*, 409 F.3d 941, 948 (8th Cir. 2005)). "A petit jury's guilty verdict renders any errors in the charging decision not prejudicial." *Id.* (citing *United States v. Louper-Morris*, 672 F.3d 539, 559 (8th Cir. 2012)).

### B. There Was No Falsehood Before the Grand Jury and No Basis to Dismiss the Indictment Based on Grand Jury Error.

Miller argues for the first time before this Court that the indictment against him should be dismissed based on his claim that one of the government's case agents made a false statement before the grand jury. But Miller never moved the district court to dismiss the indictment on this basis, so his claim is forfeited. *See Smialek*, 970 F.3d at 1075. Even if Miller had raised this issue before the district court, his claim would fail, because (1) the grand jury testimony was

29

not false, and (2) the petit jury's verdict renders any error harmless in any event.

Miller's argument focuses on a brief snippet of testimony given by one of the government's case agents before the grand jury on October 20, 2020:

> Q.   Magazine Solutions is the fraudulent magazine company owned by Amondo Miller, correct?
>
> A.   Yes.
>
> Q.   Amondo Miller we talked about before is a lead broker but he's also a company owner?
>
> A.   Correct.

(Def.'s Br. at 13-14.)

As an initial matter, Miller's claim fails because this testimony was not false. It was consistent with trial testimony from several of Miller's employees—some of whom were Miller's own witnesses—that Magazine Solutions was Miller's company. Two of Miller's employees at Magazine Solutions—Macario Aguilar and Brittany Wilson—testified that Miller was the person in charge of Magazine Solutions. (Tr./VII 1316 (Aguilar), 1417 (Wilson).) Aguilar testified that Miller taught him to deceive customers, Miller gave him the false sales script

30

to use with customers, Miller gave him sales sheets labeled Power Sales and Marketing to fill in with customer information, and Miller was the one who Aguilar "really dealt with when it came to things being said on the phone." (*Id.* 1309-1313, 1316.) Aguilar testified that Miller would listen in on his sales calls with customers and would sometimes call Aguilar into his office after a call to critique Aguilar's technique. (*Id.* 1328-29.)

Similarly, Wilson testified to her understanding of Miller's control of Magazine Solutions:

> Q.    From your perspective working there, who ultimately was in charge of that company?
>
> A.    Definitely Mr. Amondo.
>
> Q.    Why do you say "definitely?"
>
> A.    Because he, like, made it clear he was the boss. It was like his company.
>
> Q.    How did he make it clear it was his company?
>
> A.    By saying those words. Like this is my company, like it's not his wife or Sue's company or anybody else. It's his money and he made that clear.

(*Id.* 1417-18.)

Appellate Case: 24-3166    Page: 38    Date Filed: 04/11/2025 Entry ID: 5505443

Moreover, Miller's own witnesses, including two of his former Magazine Solutions telemarketers and his chauffeur, further testified that Magazine Solutions was Miller's company. (Tr./XIV 3179 (Dolezal, testifying that Miller "treated his employees well and also his, his customers"); 3206-07 (Ortega, testifying that Miller "took care of his employees" and that she worked at "Amondo's company"); 3239-40 (Ruiz, agreeing that "Amondo Miller was the boss of Magazine Solutions" and it was "his business")).

Miller argues that the case agent's testimony that Miller owned a fraudulent magazine company amounted to perjury because Miller's name did not appear on the incorporation documents for Magazine Solutions that were filed with the Secretary of State. But even if Miller's use of his wife and cousin as nominee owners on the incorporation paperwork for Magazine Solutions could render the testimony false, which it does not, Miller's claim would still fail because the petit jury's guilty verdict would render the error harmless. *See Smialek*, 970 F.3d at 1075.

Miller's counsel fully explored this issue during the case agent's cross examination during trial. Indeed, Miller's counsel began her

32

cross-examination by asking the case agent about his grand jury testimony:

> Q. Let me first talk about the topic of ownership. You testified before the grand jury that Mr. Miller was the owner of Magazine Solutions. Do you recall that?
>
> A. Yeah, vaguely.
>
> Q. And that testimony was on October 13, 2020; is that right?
>
> A. Yeah. Makes sense.
>
> Q. Okay. When you made that statement, you had not examined the Colorado Secretary of State records for Magazine Solutions, had you?
>
> A. No. I think it was probably anecdotal.

(Tr./VIII 1644.) Miller's counsel continued by walking the case agent through a series of exhibits from the Colorado Secretary of State's Office, establishing over the course of nearly ten transcript pages that Miller's name did not appear on the Secretary of State's Office filings for Magazine Solutions until 2019. (*Id.* 1644-1649, 1691-1694.) Notably, Miller's own exhibit from the Colorado Secretary of State reflected that in September 2019, Miller made a filing with the Secretary of State's Office on Magazine Solutions' behalf. (*Id.* 1693-94; Miller Exh. 7 at 23.)

33

Miller's counsel also had an opportunity to fully cross-examine Miller's employees about their understanding the Miller owned Magazine Solutions. Miller's counsel explored with Aguilar the legal ownership of Magazine Solutions, and Aguilar testified that regardless of the legal ownership of the company, "[w]e saw it as he [Miller] was the owner." (*Id.* 1356.)

The case Miller cites for the proposition that prosecutors' presentation of perjured testimony can amount to a due process violation involved an allegation that prosecutors *knowingly* presented perjured testimony at the defendant's *trial. See United States v. Bass*, 478 F.3d 948, 950-51 (8th Cir. 2008) (emphases added). But the defendant's own cases establish that even if "errors in the charging decision . . . may have followed from the conduct of the prosecution or [an agent], the petit jury's guilty verdict render[s] those errors harmless." *United States v. Kouba*, 822 F.2d 768, 774 (8th Cir. 1987).

For example, in *United States v. Fenner*, the government's case agent misidentified a drug exhibit during grand jury testimony in a fentanyl case. 600 F.3d 1014, 1021 (8th Cir. 2010). The defendants moved to dismiss the indictment on the ground that the government

34

"deceived the grand jury into thinking all the substances had been 'truly tested' when they had not been." *Id.* After declining to label the "potentially innocent misstatement as misconduct," this Court found that "even if we were to assume prosecutorial misconduct occurred, it is well-established that a petit jury's guilty verdict normally renders errors in the grand jury proceedings harmless." *Id.* (citing *Pumpkin Seed*, 572 F.3d at 556-57).

In this case, the case agent's testimony before the grand jury that Miller was the owner of Magazine Solutions was not false. Rather, it was consistent with the documentary evidence Miller presented and trial and with Miller's employees' trial testimony that Magazine Solutions was Miller's company. In addition, Miller's counsel effectively had an opportunity to both present the Secretary of State documents and explore any perceived discrepancy with the case agent's testimony before the trial jury. As a result, Miller cannot show any actual prejudice from the grand jury testimony, and the district court did not commit plain error by failing to sua sponte dismiss the indictment on this basis.

Appellate Case: 24-3166    Page: 42    Date Filed: 04/11/2025 Entry ID: 5505443

## II. The District Court Did Not Clearly Err in Applying a 16-Level Enhancement for Loss Amount Over $1.5 Million.

### A. Standard of Review and Legal Standard

This Court reviews the district court's interpretation and application of the Sentencing Guidelines de novo and its findings of fact for clear error. *United States v. Savage*, 414 F.3d 964, 966 (8th Cir. 2005). Miller's arguments faults the district court's factfinding, so this Court applies clear error review.

The Guidelines related to fraud crimes provide for a 16-level increase in the offense level if the loss from the defendant's offense is more than $1.5 million but less than $3.5 million. U.S.S.G. § 2B1.1(b)(1)(I). The Guidelines define "loss" as "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1(b)(1), n. A. "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense," and "intended loss" is "the pecuniary harm that the defendant purposely sought to inflict[.]" *Id.* n. C(i)-(ii).

As long as the district court's loss amount determination "is plausible in light of the record as a whole, clear error does not exist." *United States v. Karie*, 976 F.3d 800, 804 (8th Cir. 2020) (quoting *United States v. Harmon*, 944 F.3d 734, 738 (8th Cir. 2019)). "Though

36

the government must prove sentencing enhancements by a preponderance of the evidence, the district court does not have to make a precise determination of the loss, only a reasonable estimate." *Id.*

**B. The District Court Did Not Clearly Err by Finding the Loss That Resulted From Miller's Offense Was Between $1.5 Million and $3.5 Million.**

After reviewing both parties' sentencing position pleadings and hearing both parties' arguments, the district court properly calculated the loss from Miller's offense to be $2,722,431.11 and applied a 16-level increase under Section 2B1.1(b)(1)(I). (R. Doc. 2562, at 25-26.) The district court's calculation was reasonably based on evidence received at trial. Specifically, the online tool Miller and his employees used to track their magazine orders reflected that this was the total amount of money Magazine Solutions collected from its victims. (Gov't Exh. P2.)

Miller argues, without analysis, that there was "insufficient evidence tying "$2,722,431.11 in losses directly to [him]." (Def.'s Br. at 7.) But the district court had before it a cash status report from Magazine Solutions' customer relationship management tool, PS Online, reflecting that the total amount of money Magazine Solutions

received from victims was $2,722,431.11, along with trial testimony that Miller ran Magazine Solutions and directed his employees on how to defraud victims. (Tr./XIII 2766-2770; Gov't Exh. P2.) The PS Online cash status report further reflected that the total original value of Magazine Solutions' fraudulent contracts with victims was $4,909,840.56. (*Id.*)

At the sentencing hearing, Miller's counsel objected to the district court's reliance on the PS Online cash status report based on purported discrepancies that counsel claimed undermined the credibility of the report. (R. Doc. 2562, at 6-9.) Specifically, Miller claimed that the cash status report contained entries beginning in November 2010, when Miller claimed he had not yet joined the conspiracy, that the cash status report contained entries from dates before Magazine Solutions contracted with PS Online, that Miller had identified approximately $10,000 in transactions that he claimed were included in the cash status report in error, and that the amount reflected in the cash status report differed from the amount of the deposits into Miller's companies' US Bank accounts. (*Id.*)

Appellate Case: 24-3166    Page: 45    Date Filed: 04/11/2025 Entry ID: 5505443

The government pointed out that even if the court deducted the amounts that Miller challenged from the PS Online cash status report, the offset would be small and would not result in a loss amount below $1.5 million. (*Id.* at 13-14.) The government further reminded the district court of the trial testimony regarding the reliability of the cash status report, argued that $2,722,431.11 was a conservative loss figure, and pointed out that the government could have advocated for intended loss based on the $4,909,840.56 that Magazine Solutions attempted to collect from its customers. (*Id.* at 13-15.) The district court found a loss amount of $2,722,431.11, reasoning as follows:

> I do find, based on the evidence at trial, that the dollar amount from PS Online is probably the best measure of money going through these companies. I recognize that there are some differences with the US Bank account, but at the same time, I think that to be consistent, we're trying to use the PS Online numbers throughout.

(*Id.* at 20.)

In *United States v. Bradford*, 113 F.4th 1019, 1025-26 (8th Cir. 2024), this Court recently affirmed a loss calculation in a fraud case that was based on the district court crediting the government's expert report calculating the amount of loss. *See also United States v. Gaye*, 902 F.3d 780, 790 (8th Cir. 2018) (affirming loss calculation where

39

district court relied on chart provided by the government at sentencing hearing). In doing so, the Court recognized that "[t]he district court at sentencing 'need only make a reasonable estimate of the loss.'" *Bradford,* 113 F.4th at 1026 (quoting *United States v. Hodge*, 588 F.3d 970, 975 (8th Cir. 2009)). The Court "defer[red] to the district court's loss calculation because it is in a unique position to assess the evidence and estimate the loss based upon that evidence." *Id.* (cleaned up).

Miller's disagreement with the district court's credibility determination regarding the PS Online cash status report is not sufficient to establish clear error. The district court's factual findings in support of its application of the enhancement for loss amount were not erroneous, much less clearly so. The district court's conclusion that $2,722,431.11 was a reasonable estimate of the actual loss attributable to Miller was supported by more than the required preponderance of the evidence. Miller's assertion that the enhancement was incorrectly applied should accordingly be rejected.

Appellate Case: 24-3166    Page: 47    Date Filed: 04/11/2025 Entry ID: 5505443

## III. The District Court Did Not Abuse Its Discretion by Imposing a 96-Month Sentence.

### A. Standard of Review

This Court reviews the substantive reasonableness of a sentence for abuse of discretion. *United States v. Burns*, 834 F.3d 887, 890 (8th Cir. 2016). This Court "may find abuse of discretion where the sentencing court fails to consider a relevant factor that should have received significant weight, gives significant weight to an improper or irrelevant factor, or considers only appropriate factors but commits clear error of judgment in weighing those factors." *United States v. Bonnell*, 932 F.3d 1080, 1083 (8th Cir. 2019) (cleaned up). The defendant bears the burden on appeal to establish that, after consideration of the § 3553(a) factors, his sentence is too harsh. *United States v. Bolden*, 596 F.3d 976, 984-85 (8th Cir. 2010).

In reviewing for substantive reasonableness, this Court gives "great deference to the district court." *United States v. Jones*, 701 F.3d 327, 330 (8th Cir. 2012). District courts have "wide latitude" to weigh factors and to assign some factors greater or lesser weight than others. *See, e.g., United States v. Wisecarver*, 911 F.3d 554, 558 (8th Cir. 2018). As a result, "[t]he district court does not abuse its discretion simply

41

because it weighs the relevant § 3553(a) factors differently than the defendant thinks appropriate." *United States v. Skog*, 820 F. App'x 494, 496 (8th Cir. 2020). Nor does the mere fact that the district court could have weighed the sentencing factors differently amount to an abuse of discretion. *See*, *e.g.*, *United States v. Hall*, 825 F.3d 373, 375 (8th Cir. 2016).

This Court has observed that "it will be the unusual case when we reverse a district court sentence—whether within, above, or below the applicable Guidelines range—as substantively unreasonable." *United States v. Feemster*, 572 F.3d 455, 464 (8th Cir. 2009) (en banc) (cleaned up). The fact that an appellate court "might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." *Id.* at 462 (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)). And where, as here, the sentencing court varied downward, this Court has observed that "it is nearly inconceivable that the court abused its discretion in not varying downward still further." *United States v. Lazarski*, 560 F.3d 731, 733 (8th Cir. 2009); *see also United States v. Anwar*, 880 F.3d 958, 973 (8th Cir. 2018) (same).

**B.    The District Court Did Not Abuse Its Discretion by Imposing a 96-Month Term of Imprisonment.**

The district court varied downward to a sentence of 96 months' imprisonment from an advisory range of 168 to 210 months after carefully considering the § 3553(a) sentencing factors. The district court made an appropriate exercise of its discretion in sentencing Miller to 96 months' imprisonment for his role in defrauding seniors and other vulnerable individuals out of millions of dollars in a nationwide magazine telemarketing fraud scheme.

The district court thoroughly and compellingly explained its sentence. The district court emphasized the seriousness of a fraud scheme that was "the largest elder fraud set of convictions in the nation," and Miller's role as "an owner and you were involved in passing along the lists." (R. Doc. 2562, at 56.) The court noted both the positive and negative aspects of Miller's history and characteristics. (*Id.* at 55-56.) The court also emphasized the need to avoid unwarranted sentencing disparities and the need to avoid penalizing Miller for exercising his right to trial. (*Id.*) Having varied downward substantially after balancing both aggravating and mitigating circumstances, the district court committed no abuse of discretion

43

here. This is certainly not the nearly inconceivable case in which the court abused its discretion in not varying downward still further.

Miller argues that the district court's 96-month sentence created unwarranted sentencing disparities with some of his co-conspirators in the fraud scheme, including Stacey Persons, Brian Williams, and Jared Michelizzi. (Def.'s Br. at 18-19.) As this Court has emphasized, however, "[t]he statutory direction to avoid unwarranted sentencing disparities among defendants, 18 U.S.C. § 3553(a)(6), refers to national disparities, not differences among co-conspirators." *United States v. Pierre*, 870 F.3d 845, 850 (8th Cir. 2017) (citing *United States v. Fry*, 792 F.3d 884, 892-93 (8th Cir. 2015)). Thus, Miller's assertion that a comparison with his co-defendants demonstrates an abuse of discretion "founders on a mistaken premise." *Id.* at 850; *see also Gaye*, 902 F.3d at 791 (same).

In support of his claim of an unwarranted disparity, Miller relies on *United States v. Lazenby*, 439 F.3d 928 (8th Cir. 2006), a consolidated appeal of similarly situated co-conspirators with an "extreme disparity" in sentencing. (Def.'s Br. 5475656, at 18.) In addition to the national-disparities admonitions in cases like *Pierre*

44

and *Gaye*, the precedential value of *Lazenby* has been questioned by this Court. *United States v. McDowell*, 676 F.3d 730, 733-34 (8th Cir. 2012) (noting that *Lazenby*'s focus on "extraordinary circumstances" renders its precedential value "suspect" after *Gall*).

The Court has repeatedly distinguished *Lazenby* from cases like this one, in which one defendant is comparing his sentence to other defendants whose sentences are not under review in the same appeal. *See United States v. Soliz*, 857 F.3d 781, 783 (8th Cir. 2017) (noting that *Lazenby* "addressed the unusual circumstance of extreme disparities between the sentences of co-conspirators, reviewed in a consolidated appeal"). Most recently, this Court rejected a defendant's claim that his sentence created an unwarranted disparity with his co-conspirators on the ground that "[t]he lack of a consolidated appeal precludes a determination whether apparent disparities are justified by the co-conspirators' different roles in what in this case was an extensive overarching conspiracy, which would mean they were not 'found guilty of similar conduct.'" *United States v. Dickson*, 127 F.4th 722, 730 (8th Cir. 2025).

In any event, Miller's sentence did not create any unwarranted sentencing disparities. Far from ignoring the sentences of Miller's co-conspirators, the district court varied downward to 96 months' imprisonment in part based upon explicit consideration of the sentences the district court had previously imposed, including on Miller's co-conspirator Anthony Moulder. As the district court explained:

> Bear in mind that I have to take into account the sentences given to co-defendants, that that is significant. I can't—in terms of no unwarranted sentencing disparities, I can't put you up as high as Mr. Anthony Moulder, in part because of the massive amount of money involved in his case. I feel that you belong below that, but at the same time, [the government] makes really good points about the extent of your involvement in this case.

(R. Doc. 2562, at 55-56.)

The district court thoroughly analyzed the manner in which the co-conspirators were similarly and dissimilarly situated. More broadly, the court calibrated its sentence of Miller to reflect not only comparisons with his co-conspirators, but also all of the other § 3553(a) aggravating and mitigating factors. The district court does not abuse its discretion by weighing aggravating and mitigating factors differently than the defendant would have liked. *Hall*, 825 F.3d

46

at 375 ("[T]he mere fact that the court could have weighed the sentencing factors differently does not amount to an abuse of discretion.").

The district court made careful exercise of its sentencing discretion in this matter. Its judgment should be affirmed.

## IV. The Verdict Was Supported by Overwhelming Evidence.

### A. Standard of Review

This Court reviews de novo the denial of a motion for a judgment of acquittal due to insufficiency of the evidence. *United States v. Aungie*, 4 F.4th 638, 643 (8th Cir. 2021). This Court applies the same standard of review to the district court's denial as it does to a sufficiency of the evidence challenge. *Id.* The Court "views the entire record in the light most favorable to the government, resolves all evidentiary conflicts accordingly, and accepts all reasonable inferences supporting the jury's verdict." *Id.* (cleaned up). This Court does not "weigh the evidence or assess the credibility of the witnesses." *United States v. Lundstrom*, 880 F.3d 423, 436 (8th Cir. 2018). Rather, the Supreme Court has emphasized, "it is the responsibility of the jury— not the court—to decide what conclusions should be drawn from

47

evidence admitted at trial." *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011) (per curiam).

This Court describes the standard of review here as "very strict." *United States v. Druger*, 920 F.3d 567, 569 (8th Cir. 2019) (cleaned up). This Court will reverse a conviction "only if [it] conclude[s] that no reasonable jury could have found the accused guilty beyond a reasonable doubt." *Id.* (cleaned up). "As long as one theory based on the evidence presented could allow for a reasonable jury to find [the defendant] guilty beyond a reasonable doubt," this Court will uphold the jury verdict. *Id.*

## B. The Evidence Was Sufficient.

Miller was charged with conspiring to commit mail fraud by participating in a nationwide telemarketing scheme that defrauded hundreds of victims—including elderly and otherwise vulnerable individuals—by lying to the victims on telemarketing calls to trick them into paying for unwanted, new magazine subscriptions. In order to prove Miller guilty, the government was required to prove: (1) "that two or more persons reached an agreement or came to an understanding to devise, make up, or participate in a scheme to

48

defraud [victims] out of money or property, by means of material false representations or promises;" (2) "that [Miller] voluntarily and intentionally joined in the agreement or understanding, either at the time it was first reached or at some later time while it was still in effect;" and (3) "that at the time [Miller] joined in the agreement or understanding, he knew the purpose of the agreement or understanding." *United States v. Hansen*, 791 F.3d 863, 870-71 (8th Cir. 2015).

As the district court correctly found in denying Miller's motion for judgment of acquittal, "the government introduced copious evidence supporting the convictions." (R. Doc. 2307, at 4.) Miller's indicted co-conspirators confirmed his membership in the telemarketing conspiracy. (Tr./IV 557 (Dahl); Tr./VI 1022-23 (Klibanoff); Tr./VII 1430 (Sierra); Tr./IV 1990, 1997 (Michelizzi)). After testifying that Miller was "part of this fraud scheme," lead broker Daniel Klibanoff described Miller's role in the conspiracy as follows:

> Well, twofold. One is that he was looking for—he was selling magazines and looking for PDS names; and secondly, he was selling leads and acting as a list broker. I really don't know where the leads that he sold, where they came from, but he had contacts and he was able to get his hands on hard copies.

49

(Tr./VI 1022-23.)

Co-conspirator Wayne Dahl explained how he first met Miller. It started with a confrontation he had with Brian Cox, a separate lead broker who participated in the conspiracy. According to Dahl, he "paid good money" to Cox for "some files that did not perform" (i.e., leads that did not yield fraudulent sales), so Dahl flew to Georgia, where Cox lived, and confronted Cox directly. (Tr./IV 574.) Dahl explained that Cox "started crying a little" and then "made a phone call to the person he got the leads from, which was Amondo Miller." (*Id.*) Eventually, Cox "put [Dahl] on the phone with Amondo." (*Id.* 576.) Dahl and Miller later communicated directly via email. (*Id.*) Dahl described this as extremely valuable because Miller "had really good data, hard copies, which are the best leads you can buy in the industry, and you make an extremely large amount of money of that data." (*Id.*)

Dahl's testimony was corroborated by emails between Dahl and Miller in which the two discussed the fraudulent magazine business and the sale of "PDS renewal files." (Gov't Exh. C-9; *see also* Gov't Exhs. C-8, C-10, C-12, C-13, C-20, C-21, C-22, C-23, C-27.) Emails between Miller and other members of the conspiracy also discussed

50

the fraudulent scheme using the vernacular of the conspiracy, including terms like "hard copy" and "PDS":



**Hard copy sample**

| | |
|---|---|
| From: | magsolutions1 <magsolutions1@aol.com> |
| To: | Daniel Klibanoff <daniel@multimedialists.com> |
| Date: | Wed, 01 Apr 2015 10:08:47 -0500 |
| Attachments: | 2015033110467.pdf (903.47 kB) |

New hard copies available. Here is a sample. Have a great day!

Amondo Miller
7203130171



**[No Subject]**

| | |
|---|---|
| From: | Amondo Miller <magsolutions1@aol.com> |
| To: | jared@westsidereaderz.com |
| Date: | Mon, 11 Apr 2016 10:45:27 -0500 |
| Attachments: | westside test.xlsx (21.31 kB) |

Hello Jared. This is a new PDS feed. Test it out. Hot file right here! Have a good day buddy.

Amondo Miller 720-313-0171

Gov't Exh. C-24                    Gov't Exh. C-32

As set forth above, Miller's co-conspirators testified that Miller's handwritten "hard copy" leads were "the best leads you could possibly get." (Tr./V 856.)

In addition to Miller's interactions with other fraudulent company owners and lead brokers, the jury heard testimony about the internal operations of Miller's company, Magazine Solutions, from his former employees. Former Magazine Solutions telemarketers Macario Aguilar and Brittany Wilson testified about how Miller ran the company. (Tr./VII 1417-18.) According to their testimony, Miller oversaw the company's sales floor (*Id.* 1328-29, 1396); Miller trained telemarketers how to deceive victims (*Id.* 1309); and Miller provided telemarketers with the scripts they used to perpetrate the fraud (*Id.* 1311, 1396).

The jury also heard evidence that Miller was aware that his telemarketers were following the scripts Miller provided and repeating the lies contained in them. The testimony at trial—including the testimony of Miller's witnesses—established that Miller listened in on his telemarketers' sales calls. (Tr./VII 1328; Tr./XIV 3239-40.) Miller monitored the calls to ensure that his telemarketers were lying to customers as his scripts instructed. (*Id.*) In addition, Miller made his own calls to victims on at least 451 occasions between 2014 and 2020. (Tr./XIII 2772-74; Gov't Exh. P-4.)

Aguilar and Wilson also testified that Miller gave his telemarketers blank Power Sales and Marketing lead sheets. (Tr./VII, 1312-13.) Each salesperson "would have a little stack of [those lead sheets] on their table, and the telemarketers would fill in the customer information whenever they made a "sale." (*Id.*) Miller stored the completed Power Sales and Marketing lead sheets in a closet at the Magazine Solutions office, (*id.* 1316), and then he sold those leads to other companies in the fraudulent magazine industry. (*See* Gov't Exhs. C-24, C-32.)

Miller makes several arguments as to why he claims the evidence was insufficient. None is persuasive. First, Miller argues that the sales pitch employed by Magazine Solutions did not contain any fraudulent representations. (Def.'s Br. at 19, 21.) But as Aguilar and Wilson explained—and as the scripts themselves demonstrate—the scripts at Magazine Solutions contained all the hallmarks of the fraud and deception at the heart of the conspiracy.

Miller's telemarketers falsely stated to victims that they were "not calling to collect any money." (Tr./VII 1396-98.) They falsely represented themselves as calling solely about magazines the victims were already receiving. (*Id*. 1311-12, 1396-97.) They never told victims that the telemarketers were signing them up for new subscription packages. (*Id*.)

As Wilson explained, the Magazine Solutions telemarketers were "calling to sign [victims] up for a new magazine subscription, which entitled collecting money." (*Id*. 1398.) When pressed on this topic during cross-examination, Wilson was resolute:

> Q.    [I]f a customer already had a subscription or an order with Magazine Solutions, this script wouldn't be a lie, would it?

Appellate Case: 24-3166    Page: 60    Date Filed: 04/11/2025 Entry ID: 5505443

A.     I would say yes because we were calling to, like, get more money from them. So, yes, I would say it's a lie.

Q.     But you weren't calling—but if you were representing that you were, you know, from their company, that would be true. Yes?

A.     Yes, that is true. I think the main part that is a lie is in the second paragraph, "I am not calling to collect any money from you. I am calling to make sure they are coming out on time and in good condition." And if they would respond yes or no, we would get them for more money. So, yeah, I would say the second paragraph is definitely a lie.

(*Id.* 1407-1408.) Asked whether he ever used "a truthful pitch as a capper for Mr. Miller," Aguilar responded, "No. It was all deception the entire time." (*Id.* at 1331.)

Second, Miller claims that the government failed to present evidence of his agreement to participate in a conspiracy. (Def.'s Br., at 19.) "A defendant's agreement to enter a conspiracy does not have to be explicit, but can consist of a tacit or implicit understanding." *United States v. Weston*, 443 F.3d 661, 669 (8th Cir. 2006) (citing *United States v. Kessler*, 321 F.3d 699, 702 (8th Cir. 2003)). In this case, multiple cooperating co-conspirators testified that they purchased leads from Miller for purposes of using the leads to defraud victims. (Tr./II 395 (Dahl); Tr./VII 1434 (Sierra); Tr./IX 1943 (Michelizzi)). One

54

of these cooperating witnesses explicitly testified that he "conspired" with Miller to commit fraud. (Tr./IV 557.) In addition, Miller's employees testified to his conduct at Magazine Solutions, including providing them with the scripts they used to perpetrate the fraud, training them to deceive victims, and monitoring their calls with vitims. (Tr./VII 1309, 1311, 1328, 1396; Tr./XIV 3239-40.) There was ample evidence from which a reasonable jury could find beyond a reasonable doubt that Miller agreed to participate in the conspiracy.

Third, Miller argues that the government failed to "implicate Miller in any overt acts." (Def.'s Br. at 7.) But "a conspiracy conviction under § 1349 does not require proof of an overt act." *United States v. Roy*, 783 F.3d 418 (2d Cir. 2015) (citing, *inter alia*, *United States v. Rogers*, 769 F.3d 372, 380-82 (6th Cir. 2014); *United States v. Eason*, 579, F. App'x 807, 810 n.3 (11th Cir. 2014) (per curiam); *United States v. Pascacio-Rodriguez*, 749 F.3d 353, 363-64 & n. 49 (5th Cir. 2014); *United States v. Chinasa*, 489 F. App'x 682, 685-86 (4th Cir. 2012) (per curiam); *United States v. Fishman*, 645 F.3d 1175, 1186 (10th Cir. 2011); s*ee also* Eighth Circuit Manual of Model Jury Instructions (Criminal) (2023) § 5.06A-1 n.2 ("An overt act is not required in

conspiracies charged under . . . 18 U.S.C. § . . . 1349"); *cf. Whitfield v. United States*, 543 U.S. 209, 219 (2005) ("Because the text of § 1956(h) does not expressly make the commission of an overt act an element of the conspiracy offense, the Government need not prove an overt act to obtain a conviction.").

Even if an overt act was required, as set forth above, the government presented ample evidence of Miller's affirmative conduct in furtherance of the conspiracy. These include providing his Magazine Solutions telemarketers with blank Power Sales and Marketing lead sheets to collect customer information, selling those lead sheets to other telemarketing companies in the magazine industry, and training his Magazine Solutions telemarketers to defraud victims. (Tr./VII at 1309, 1312-13; Gov't Exhs. C-24, C-32.)

Finally, Miller claims that the government presented "insufficient evidence to tie $2,722,431.11 in losses directly to him." (Def.'s Br. at 10.) But "the United States is not required to show actual loss or harm to the victims of the fraud in order to prove wire fraud or mail fraud." *Louper-Morris*, 672 F.3d at 556. The government was not required to tie Miller to any specific loss amount to convict him at trial.

Appellate Case: 24-3166    Page: 63    Date Filed: 04/11/2025 Entry ID: 5505443

Rather, the amount of loss caused by Miller's offense was an issue to be determined by the district court at sentencing. *See supra* Section II.

The jury carefully discharged its responsibility to decide what conclusions should be drawn from the evidence admitted at trial, and its verdict is amply supported by that evidence. The judgment of conviction should be affirmed.

## **CONCLUSION**

For the foregoing reasons, the district court's judgment should be affirmed.

Dated: April 10, 2025

LISA D. KIRKPATRICK
Acting United States Attorney

*/s/ Kimberly A. Svendsen*

By: KIMBERLY A. SVENDSEN
Assistant U.S. Attorney
Attorney ID No. 0504097
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
(612) 664-5600
Attorneys for Appellee

# CERTIFICATE OF COMPLIANCE

The undersigned attorney for the United States certifies this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32. The brief has 10,264 words, proportionally spaced using Century Schoolbook, 14-point font. The brief was prepared using Microsoft Word 365.

Dated: April 10, 2025

LISA D. KIRKPATRICK
Acting United States Attorney

*/s/ Kimberly A. Svendsen*

By: KIMBERLY A. SVENDSEN
Assistant U.S. Attorney
Attorney ID No. 0504097
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
(612) 664-5600
Attorneys for Appellee

58